UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Charles B. Tiller,                         Case No. 3:13-cv-02150

       Plaintiff

   v.                                MEMORANDUM OPINION
                                      AND ORDER

International Automotive Components, et al.,

       Defendants


### I. INTRODUCTION

Defendant IAC Huron, LLC, has filed a motion for summary judgment on all claims asserted against it by Plaintiff Charles Tiller. (Doc. No. 17). Tiller filed a brief in opposition, (Doc. No. 19), as well as a motion for leave to file an affidavit in support of his opposition brief. (Doc. No. 23). IAC filed a reply brief in support of its motion, (Doc. No. 21), and a supplemental brief responding to Tiller's motion for leave. (Doc. No. 26). For the reasons stated below, both Tiller's motion for leave and IAC's motion for summary judgment are granted.

### II. BACKGROUND

IAC owns a plant in Huron, Ohio, where the company manufactures interior automotive parts for a number of car manufacturers. IAC purchased the plant from Lear Corporation in 2007; Lear purchased the plant in 1994 from O'Sullivan Corporation, shortly after Tiller began working there. Tiller first worked as a process painter before becoming a forklift operator. He later was transferred to a machine operator position. Tiller was a member of the United Auto Workers Local

913, and his employment was governed by the terms of a collective bargaining agreement between Local 913 and IAC. Tiller was terminated on February 4, 2013, following an investigation into a workplace incident in which Tiller allegedly assaulted another employee.

In the summer of 2012, Tiller loaned $300 to William Walton, a coworker and family friend. Walton repaid some of the money shortly after borrowing it. Walton and Tiller worked in separate departments, though both on the first shift, until November 2012, when Walton was transferred to the third shift. Tiller attempted to contact Walton on his cell phone to seek repayment, but Walton's phone was turned off. Tiller arrived at work early on several occasions between November 2012 and January 2013, hoping to talk with Walton about the debt as Walton's shift ended and Tiller's began. These efforts were unsuccessful until January 30, 2013, when Tiller saw Walton working at a machine in the acoustics department.

Tiller testified he approached Walton from behind and startled Walton when he said "hey." (Doc. No. 18-1 at 13). Walton then began screaming at Tiller, telling Tiller he had something to do and that Tiller should leave him alone until Walton was free later on. Tiller stated neither he nor Walton made contact with the other, though Tiller testified Walton was pointing his finger in Tiller's face. Tiller told Walton three times that he "want[ed] his money" before Rick Yontz, an IAC supervisor, ordered Tiller to leave the area. (Id.).

John McDermitt, IAC's Human Resource Manager, and Jim Gano, IAC's Operations Manager, led the investigation into the incident. Tiller's union representative, Chad Slocum, and Sherry Wilson, the Local 913 Chairperson, also were present during interviews conducted as part of the investigation. Several other IAC employees witnessed the incident and provided signed statements. Two of these employees – Jeremy Ach and Rene Hensel – stated they saw Tiller shove or hit Walton in the back of the head while Walton was facing away from Tiller. (Doc. No. 20-1 at 11, 13). Both also stated Tiller, not Walton, was the more aggressive party in the ensuing conversation. Another employee, Lisa Agee, did not see any contact between Tiller and Walton but

2

stated Tiller was "being loud and getting more up in [Walton's] face . . . [while Walton] didn't do anything – he just took it." (Doc. No. 20 at 15). A fourth witness, Joe Pepitone, saw Walton and Tiller "standing almost nose to nose having a discussion," but could not hear what they were saying. (Doc. No. 20-1 at 14). Another IAC employee, Matt Romell, stated he did not see the incident between Tiller and Walton but reported he had seen Tiller in the department on two previous occasions when Walton was not at work. (Doc. No. 20-1 at 12).

McDermitt and Gano first talked with Tiller and Walton together, with Slocum and Wilson present. Both Tiller and Walton denied there was a physical altercation. (Doc. No. 18-1 at 16). McDermitt and Gano then interviewed the two men separately, at least in part because they believed Walton appeared to be afraid of Tiller. (Doc. No. 18-22 at 1-2). Both continued to deny a physical altercation, though Walton stated Tiller "probably bumped" his hat. (Doc. No. 23-1 at 2; Doc. No. 18-10 at 2). Tiller was suspended pending further investigation.

The collective bargaining agreement between IAC and Local 913 authorizes IAC to establish shop rules. (Doc. No. 18-4 at 10). IAC issued 26 "plant rules for personal conduct," including Rule # 11, which prohibits threatening, intimidating, coercing, or interfering with employees or supervision at any time. (Doc. No. 18-6). This policy considers conduct violating Rule #11 to be "very serious in nature," and an employee found to have violated that rule may be suspended or terminated following the first offense. (Id.).

IAC also issued a "Workplace Violence and Weapons Policy" which, among other things, prohibits employees from engaging in "threats or acts of violence." (Doc. No. 18-7). The policy defines threats or acts of violence as "any threatening behavior, acts of violence or any related conduct which disrupts another's work performance or the organization's business purpose." (Id. at 1). The Workplace Violence and Weapons Policy also identifies specific examples of conduct prohibited as "threats or acts of violence," including "[h]itting, shoving, or throwing an object at an individual," and "[a]cts of intimidation, including threatening to harm an individual or his/her

3

family, friends, associates, or property." (Id. at 1-2). The policy permits IAC to suspend an employee without pay pending further investigation into accusations of threats or acts of violence and permits dismissal for violations of the policy. (Id. at 2).

Additionally, IAC implemented a "Harassment-Free Workplace Policy," which states "[n]othing detracts from the work environment more than harassment of employees, for any reasons" and "expressly prohibits . . . any form of protected-basis discrimination or harassment." (Doc. No. 18-8 at 1). Employees who violate this policy are subject to discipline, including termination.

Ultimately, Tiller was terminated for violating Plant Rule # 11, the Workplace Violence and Weapons Policy, and the Harassment Free Workplace Policy. (Doc. No. 18-12). Through Local 913, Tiller filed a grievance regarding his suspension and ultimate termination. (Doc. No. 18-13). The union attempted to persuade IAC to reinstate Tiller but withdrew the grievance prior to arbitration after its attempts were unsuccessful. (Doc. No. 18-14). Tiller filed suit in the Erie County, Ohio Court of Common Pleas on September 3, 2013. IAC timely removed the case to federal court.

### III. STANDARD

A district court shall grant a party's motion for summary judgment if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant may meet its burden by showing there is an absence of evidence to support an element of a claim on which the nonmovant has the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant has satisfied its burden, the nonmovant then must set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v.*

4

*State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

## IV. ANALYSIS

Tiller asserted claims for race discrimination, retaliation, and breach of contract. (Doc. No. 1). IAC filed its motion for summary judgment as to all three claims. (Doc. No. 17 at 1). Tiller acknowledges IAC is entitled to judgment as a matter of law on his retaliation and breach of contract claims, and has conceded those claims. (Doc. No. 19 at 7). Thus, I will grant IAC's motion as to counts two and three of the complaint and analyze IAC's motion as to the sole remaining claim of race discrimination in violation of Ohio Revised Code § 4112.02(A) below.

Tiller seeks leave to file in support of his opposition a late-arriving affidavit from Walton. (Doc. No. 23). Tiller asserts IAC will not be prejudiced by my acceptance of the late filing because the affidavit merely supports the factual assertions Tiller already made in his opposition brief, and does not add any new facts. While IAC argues the affidavit does not create a material issue of fact sufficient to defeat its summary judgment motion, it does not object to Tiller's motion for leave and has utilized the opportunity to respond directly to the contents of Walton's affidavit. Therefore, Tiller's motion for leave is granted.

Ohio law prohibits employers from discharging without just cause or otherwise discriminating against an employee because of that employee's race. Ohio Rev. Code § 4112.02(A). "[F]ederal case law interpreting Title VII of the Civil Rights Act of 1964, Section 200e et seq., Title 42 U.S.Code, is generally applicable to cases involving alleged violations of [O.]R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981). When a plaintiff seeks to prove he suffered disparate treatment on the basis of his race

5

through circumstantial evidence, courts apply the three-part *McDonnell Douglas* analysis. *Id.* (citing *McDnonell Douglas v. Green*, 411 U.S. 792 (1973)).

### A. PRIMA FACIE CASE

The first level of the *McDonnell Douglas* analysis is the prima facie case. Tiller may establish a prima facie case of race discrimination by showing (1) he is a member of a protected class, (2) he was terminated, (3) he was qualified for his position, and (4) he was treated differently than a comparable non-protected employee. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992). There is no dispute Tiller is a member of a protected class or that his employment was terminated. IAC contends Tiller cannot show he was qualified for his position or that a comparable non-protected employee was treated more favorably.

A plaintiff may show he was qualified for his position "by presenting credible evidence that his . . . qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003). The specific qualifications "vary depending on the job in question, [though] the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.*

IAC argues Tiller cannot establish he was qualified for his position because he "blatantly violated IAC's policies." (Doc. No. 17 at 13). The Sixth Circuit repeatedly has rejected this type of argument at this stage of the prima facie case. In analyzing the qualification prong of the prima facie case, "a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000). A court "improperly conflat[es] the distinct stages of the *McDonnell Douglas* inquiry" when it considers the employer's discharge explanation at this stage. *Id.* at 661. In *Cline*, the Sixth Circuit ruled the district court erred when it used the employer's reason for not renewing the plaintiff's contract – because she violated the defendant's premarital sex policy – as the

6

basis for finding the plaintiff failed to establish the qualification prong of the prima facie case. *Id.*; *see also Cicero v. Borg-Warner Auto., Inc.*, 280 f.3d 579, 585 (6th Cir. 2002) ("[T]he district court erred when it failed to judge Cicero's qualifications independent of the reason that Borg-Warner now offers for firing Cicero."); *Benjamin v. Brachman*, 246 F. App'x 905, 922 (6th Cir. 2007) (concluding plaintiff was not qualified for his position based upon the employer's alleged nondiscriminatory reason would prevent the court "from ever reaching" the issue of whether plaintiff's discharge was based upon impermissible considerations); *Sokolnicki v. Cingular Wireless, LLC*, 331 F. App'x 362, 367 (6th Cir. 2009) (district court erred in considering evidence of plaintiff's violation of company policy when determining the qualification prong because defendant identified those policy violations as basis for termination).

In support of its argument, IAC cites to *Mayfield v. Kaiser Pickles, LLC*, No. 1:12-cv-229, 2013 WL 940404 (S.D. Ohio March 11, 2013). (Doc. No. 17 at 13). In *Mayfield*, the plaintiff was terminated after an investigation into an incident in which he allegedly punched another employee. Mayfield filed suit, claiming race and disability discrimination, and his employer moved for summary judgment. The motion was referred to a magistrate judge for a report and recommendation. The magistrate judge concluded the plaintiff failed to satisfy the qualification prong because he failed to present evidence to contradict Kaiser's evidence of his violation of the company's nonviolence policies. *Mayfield*, 2013 WL 940404, at *5. The district court adopted the magistrate judge's report and recommendation and granted the employer's summary judgment motion. *Mayfield v. Kaiser Pickles, LLC*, No. 1:12-cv-229, 2013 WL 1748055 (S.D. Ohio April 23, 2013). I decline to follow *Mayfield* for two reasons. First, it is a nonbinding unpublished opinion from a court in another district. Second, the court's reasoning is not persuasive, as it does not follow or attempt to distinguish binding and well-established Sixth Circuit precedent.

Tiller asserts his 19-year work history for IAC, Lear Corporation, and O'Sullivan Corporation shows he was qualified for his position as a machine operator. IAC does not dispute

this contention, but argues only that Tiller was not qualified because he violated IAC policies. (Doc. No. 21 at 8; Doc. No. 17 at 13). Tiller has presented sufficient evidence to satisfy the qualification prong of the prima facie case. *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987) (prima facie case is an "easily met" burden). *Cf. Geiger v. Tower Auto.*, 579 F.3d 614, 624 (6th Cir. 2009) (Reverse-discrimination plaintiff established the qualification prong of his prima facie case through evidence he previously satisfactorily fulfilled the job duties and had 27 years of experience).

IAC also argues Tiller cannot establish a prima facie case "because he cannot show a similarly situated Caucasian employee was treated more favorably . . . ." (Doc. No. 17 at 13). In order to establish this element, Tiller must show "that for the same or similar conduct he was treated differently than similarly-situated non-minority employees." *Mitchell*, 964 F.2d at 583. Tiller must demonstrate he is similarly situated to the non-protected employee in "all relevant aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). In the disciplinary context, the Sixth Circuit has found employees to be similarly situated where they have "dealt with the same supervisor, have been subject to the same standards[,] and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (quoting *Mitchell*, 964 F.2d at 583). The weight given to these factors may vary from case to case. *Johnson v. Kroger*, 319 F.3d 858, 867 (6th Cir. 2003) (citing *Ercegovich*, 154 F.3d at 352).

Tiller asserts he was treated differently than the following similarly-situated white employees: Walton, Ed Bruce, Curt Semprich, and Doug Bexley. Walton is not a similarly-situated employee. Unlike Tiller, Walton was not accused of assaulting another employee. Therefore, IAC's policies prohibiting violence or harassment in the workplace did not apply to Walton's conduct. Moreover, Walton's alleged misconduct – lying during an investigation – does not rise to the same level of seriousness as Tiller's alleged misconduct.

8

Bruce and Semprich were involved in a loud and boisterous verbal dispute when Bruce chest-bumped Semprich. (Doc. No. 20-1 at 32). Both were found to have violated IAC's Harassment Free Workplace Policy, along with other IAC rules. Bruce was suspended for 10 days and ordered to attend anger management counseling, while Semprich was suspended for 3 days, with 1 day suspended provided Semprich did not engage in similar conduct during the following 6 months. (Doc. No. 20-1 at 29, 31).

Bexley was suspended for 14 days and ordered to attend anger management counseling after he threw a part toward another employee, jumped across a table and yelled at another employee, and threatened and intimidated another employee. (Doc. No. 20-1 at 37). The record does not indicate whether one or several other employees were involved in the Bexley incident. Bexley was found to have violated the "Workplace aggression / violence policy" and Plant Rule #11. (Doc. No. 20-1 at 37-38).

Ach and Walton were inside of a tool cleaning it when Tiller entered the acoustics department. Ach reported seeing Tiller walk up behind Walton before Tiller "grab[bed] the back of [Walton's] head and shove[d] it down toward the tool." (Doc. No. 20-1 at 11). Hensel saw Tiller approach Walton and the tool from behind and give Walton "an open hand hard shot to the back of his head." (Doc. No. 20-1 at 13). Hensel told McDermitt that she was concerned Walton "could have been hurt really bad with his head down in the tool." (Doc. No. 20-1 at 13).

I conclude Tiller has not proven IAC treated a similarly-situated non-protected employee differently. Tiller admits he went into the acoustics department on several earlier occasions, looking for Walton. Tiller's alleged conduct did not occur after he and Walton argued about the money. Instead, it took place before Walton even knew Tiller was in the department. The incidents involving Bexley, Bruce, and Semprich, in contrast, arose in the heat of the moment. This element of apparent premeditation constitutes a differentiating circumstance sufficient to distinguish IAC's disciplinary response. *Ercegovich*, 154 F.3d at 352.

9

Though it does not alter the outcome of IAC's motion, I will address Tiller's assertion that I should conclude his termination was motivated by racial discrimination because "all of IAC's management is white and . . . everyone involved in [his] termination [was] white . . . ." (Doc. No. 19 at 13). The argument that an employment action must have been motivated by impermissible discrimination simply because the individual authorizing the action is of a different race than the plaintiff is blatantly meritless.

## V. CONCLUSION

For the reasons stated above, Tiller's motion for leave to file an affidavit in support of his opposition brief, (Doc. No. 23), is granted. IAC's motion for summary judgment, (Doc. No. 17), also is granted.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge

10